**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHNATHAN LEE WELLER,** | : | **Civil No.  1:19-CV-884** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **ANDREW SAUL,** | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.    Introduction

Social Security appeals often entail the evaluation of competing medical opinions. In this setting, on occasion, the sufficiency of an Administrative Law Judge's (ALJ) evaluation of this medical opinion evidence is affected by when those opinions are rendered, and the degree to which those opinions adequately address later acquired medical information.

Typically, state agency experts provide opinions regarding disability claims at an early stage of the administrative process. There is nothing improper about this procedure; indeed, some threshold medical evaluation of a claim is both appropriate and necessary. However, when an ALJ gives great weight to opinions proffered at the outset of the administrative process without providing adequate consideration to subsequent, material intervening medical events, a remand may be necessary to

ensure that sufficient and proper consideration was given to all of the medical evidence.

So it is in this case.

The plaintiff, Johnathan Lee Weller, applied for disability benefits in April of 2016. This disability application was filed shortly after Weller began counseling for a host of emotional impairments, including agoraphobia, bipolar, intermittent explosive, depressive, and mood disorders. At the time he began this counseling, and later in August of 2016 when he underwent a consultative psychological examination, Weller acknowledged having homicidal and suicidal thoughts and was experiencing possible hallucinations. Despite these reported symptoms, a state agency expert, Dr. Jonas, and a consulting expert, Dr. Miller, concluded at the outset of this process in August of 2016, that Weller was only experiencing mild to moderate symptoms, found that he could perform work, and opined that he was not disabled.

Subsequent medical evidence from two different treating sources who assessed Weller over a one-year span between October 2016 and November 2017 cast significant doubt upon these initial evaluations. Both of these treating sources concluded that Weller was profoundly impaired due to this constellation of emotional conditions, and determined that he suffered from marked or extreme limitations in multiple spheres of workplace functioning. These two treating sources

also each independently assigned Global Assessment of Functioning, or GAF, scores to Weller that were consistent with total disability.

Notwithstanding this subsequent material medical evidence, the ALJ found that Weller could meet the mental demands of the workplace and denied this disability claim. In denying Weller's disability claim, the ALJ placed significant weight upon the early state agency and consulting opinions without directly addressing how the subsequent treatment and opinion evidence spanning more than a year affected or undermined the weight to be given to those initial assessments. The ALJ also suggested that Weller's mental status examinations were generally within normal limits, an evaluation which is difficult to reconcile with Weller's reported hallucinations, or his frequent suicidal and homicidal thoughts. Finally, the ALJ reached this result without addressing, or even acknowledging the multiple GAF scores provided by treating sources, which consistently found Weller to be severely impaired emotionally.

In our view, more is needed here. Accordingly, for the reasons set forth below, we will direct that this case be remanded for further consideration by the Commissioner.

## II.   <u>Statement of Facts and of the Case</u>

On April 22, 2016, the plaintiff, Johnathan Lee Weller, applied for disability and supplemental security income benefits pursuant to Titles II and XVI of the Social

Security Act. (Tr. 12). At the time of this disability application, Weller was 39 years old, (Tr. 20), had a 9th grade education, (Tr. 31, 173), and had previously worked as a landscaper and steel worker. (Tr. 21).

Weller's disability application was based upon a constellation of severe mental health impairments which he experienced, including agoraphobia, bipolar, intermittent explosive, depressive, and mood disorders. (Tr. 14). At the time he submitted this disability application in April of 2016, Weller had only begun to treat these conditions, having commenced treatment at Philhaven Hospital in March of 2016. (Tr. 270-90). This treatment history, which spanned from 2016 through 2018, described grave emotional impairments on Weller's part. Indeed, from the outset of his treatment history, Weller indicated that his emotional impairments led him to destructive and self-destructive thoughts. Thus, at the time of his March 23, 2016 intake interview at Philhaven, Weller acknowledged both suicidal and homicidal ideation. (Tr. 287-88).

In August of 2016, at an early stage of the administrative process, Weller's mental state was assessed by a consulting source and a non-examining state agency expert. On August 10, 2016, Dr. John Miller conducted a consultative examination of Weller. (Tr. 296-301). At the time of this evaluation, it appears that Dr. Miller did not have the benefit of any treatment records relating to Weller. (Tr. 296). Instead, the doctor relied upon Weller's reports, which described severe mental impairments.

Weller reported to Dr. Miller that he experienced severe depression, crying spells, feelings of worthlessness, and recurrent suicidal ideation, including an episode of suicidal thought just two days prior to the examination. (Tr. 297). He also described occasional flashbacks and possible hallucinations that he was experiencing. (Id.) Dr. Miller diagnosed Weller as suffering from major depressive disorder with psychotic features, and described his prognosis as guarded given his difficult history. (Tr. 299).

Notwithstanding these findings, Dr. Miller opined that for the most part Weller only experienced mild to moderate symptoms, finding that he only suffered a marked impairment in dealing with the public. (Tr. 300-01). Six days later, a state agency expert, Dr. Edward Jonas, relied upon this report from Dr. Miller to conclude that Weller was not disabled and encountered at most only a handful of moderate emotional impairments. (Tr. 52-74). Dr. Jonas also reached this opinion without the benefit of any extensive treatment records documenting Weller's mental health history over time. (Tr. 54).

These preliminary findings, which were made at the outset of this process without the benefit of access to treatment records, stood in stark contrast to the findings and recommendations made over the following fifteen months by those who actually treated Weller. For example, on October 12, 2016, Christine Plasic-Van Wagner, CNRP, submitted a Residual Functional Capacity Assessment for Weller. (Tr. 305-08). In this assessment, Plasic-Van Wagner stated that Weller's highest

Global Assessment of Functioning score (GAF) over the past year was 41-50, and that his current GAF score was 31-40. (Tr. 305).

These were clinically significant findings. A GAF score, or a Global Assessment Functioning scale, was a psychometric tool which took into consideration psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR"). In this regard, GAF scores "in the range of 61–70 indicate 'some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning.' Diagnostic and Statistical Manual of Mental Disorders ('DSM IV') 34 (American Psychiatric Assoc. 2000). GAF scores in the 51–60 range indicate moderate impairment in social or occupational functioning." Cherry v. Barnhart, 29 F. App'x 898, 900 (3d Cir. 2002); DaVinci v. Astrue, 1:11-CV-1470, 2012 WL 6137324 (M.D. Pa. Sept. 21, 2012) report and recommendation adopted, Davinci v. Astrue, 1:11-CV-1470, 2012 WL 6136846 (M.D. Pa. Dec. 11, 2012). "A GAF score of 41–50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).' DSM–IV at 34. A score of 50 is on the borderline between serious and moderate symptoms." Colon v. Barnhart, 424 F. Supp. 2d 805, 809 (E.D. Pa. 2006);

see Shufelt v. Colvin, No. 1:15-CV-1026, 2016 WL 8613936, at *2 (M.D. Pa. Sept. 15, 2016), report and recommendation adopted sub nom. Shulfelt v. Colvin, No. 1:15-CV-1026, 2017 WL 1162767 (M.D. Pa. Mar. 29, 2017). A GAF score of 31-40 signifies some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. GAF scores as low as 30 typically indicate behavior that is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or an inability to function in almost all areas. Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR"); see Jones v. Colvin, No. 1:16-CV-1535, 2017 WL 4277289, at *2 (M.D. Pa. Sept. 25, 2017), report and recommendation adopted sub nom. Jones v. Berryhill, No. 1:16-CV-1535, 2017 WL 4314572 (M.D. Pa. Sept. 27, 2017). Thus, Plasic-Van Wagner's October 2016 treating source statement found that Weller was profoundly impaired. In fact, Plasic-Van Wagner concluded that Weller experienced marked limitations in 11 spheres of workplace functioning, and suffered from extreme limitations in two additional areas. (Tr. 305-08).

Thirteen months later, on November 1, 2017, another treating source, Ted Hummel, M.S., submitted a second Residual Functional Capacity Assessment for

Weller. (Tr. 309-12). In this report, Hummel noted that Weller had been homicidal and suicidal in the past. (Tr. 312). Hummel assessed Weller's GAF score at 45, a score which was emblematic of serious symptoms and suicidal ideation, as well as serious impairment in social, occupational, or school functioning. Hummel further found that Weller suffered from extreme limitations in 12 areas of mental functioning, and marked restrictions in an additional 5 fields. (Tr. 309-12).

Weller's treatment records from Philhaven provided contemporaneous confirmation of his emotional instability and potential for violence. These treatment notes were replete with references to suicidal or homicidal thoughts on Weller's part. (Tr. 335, 338, 341, 346, 347, 349). Weller's treatment notes also contained references to Weller discussing his potential for harming others, (Tr. 329, 334, 340), instances in which he verbally lashed out at others, (Tr. 329), and reports by Weller that he would become angered if strangers looked at him. (Tr. 343).

It is against this clinical backdrop that a hearing was held on this disability application on February 8, 2018. (Tr. 27-49). Weller testified at this hearing, describing his suicidal and homicidal thoughts, as well as the panic attacks he experienced several times a week. (Tr. 36-38).

Following this hearing, the ALJ issued a decision on June 8, 2018 denying Weller's application for benefits. (Tr. 9-22). In that decision, the ALJ first concluded the Weller met the insured status requirements of the Social Security Act through

December 31, 2019 and had not engaged in any substantial gainful activity since his alleged onset date of disability in January of 2015. (Tr. 14). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Weller suffered from the following severe impairments: agoraphobia, bipolar, intermittent explosive, depressive, and mood disorders. (Id.) At Step 3, the ALJ determined that none of these impairments met or medically equaled the severity of one of the listed impairments. (Tr. 15-16).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity assessment ("RFC"), which considered Weller's impairments but found that Weller could perform work at all exertional levels, provided he was limited to simple routine tasks, few workplace changes, only occasional interaction with supervisors and co-workers and no interaction with the public. (Tr. 16). In reaching this conclusion, the ALJ acknowledged that as early as March of 2016, Weller was expressing suicidal and homicidal thoughts, (Tr. 17), but otherwise described Weller's mental status as generally within normal limits. (Tr. 17-18). The ALJ did not further reconcile this benign characterization of Weller's mental status with Weller's treatment records which documented frequent references to suicidal or homicidal thoughts on Weller's part. (Tr. 335, 338, 341, 346, 347, 349), Weller's potential for harming others, (Tr. 329, 334, 340), instances in which Weller verbally lashed out at others, (Tr. 329), and reported that he would become angered if strangers looked at him. (Tr. 343).

The ALJ also gave significant weight to the preliminary state agency and consulting opinions tendered in August of 2016, opinions that were given in the absence of any treatment records, without directly addressing how the subsequent treatment and opinion evidence spanning more than a year affected or undermined the weight to be given to those initial assessments. (Tr. 19). Moreover, the ALJ's decision made no reference to the multiple treating source GAF scores for Weller spanning from October 2016 through November 2017, all of which concluded that Weller was severely impaired.

Having arrived at this RFC assessment, the ALJ found at Step 4 that Weller could perform his past work and further determined at Step 5 that there were a number of other jobs in the national economy that he could perform. (Tr. 20-21). Accordingly, the ALJ concluded that Weller did not meet the stringent standard for disability set by the Social Security Act and denied his disability claim. (Tr. 22).

This appeal followed. (Doc. 1). On appeal, Weller argues, *inter alia*, that the ALJ's reliance on these initial preliminary opinions of consulting and state agency experts did not adequately consider or address material intervening medical developments and opinions, including the numerous GAF scores that defined Weller as emotionally disabled. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we agree that this case should be remanded for further consideration by the Commissioner.

### III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir. 2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under

this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical

opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. In this setting, these cases simply restate the

commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings, 129 F. Supp. 3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her from engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this

burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C.   Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence.

The Commissioner's regulations also set standards for the evaluation of medical evidence, and define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's]

symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(c).

In deciding what weight to accord competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. § 404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. See 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources . . ."); 20 C.F.R. § 404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where

applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c).

Oftentimes, as in this case, an ALJ must evaluate medical opinions and records tendered by a number of different medical sources. Judicial review of this aspect of ALJ decision-making is guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when weighing competing medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' " Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

However, case law also cautions courts to take into account the fact that state agency non-treating and non-examining source opinions are often issued at an early stage of the administrative process. While this fact, standing alone, does not preclude consideration of the agency doctor's opinion, see Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011), it introduces another level of caution that should be applied when evaluating reliance upon such opinions to discount treating and examining source medical statements. Therefore, where a state agency non-treating and non-examining opinion does not take into account material medical developments which have occurred after the opinion was rendered, that opinion often cannot be relied upon by the Commissioner to carry its burden of proof. See Batdorf v. Colvin, 206 F. Supp. 3d 1012, 1023 (M.D. Pa. 2016).

**D.      A Remand is Appropriate in this Case.**

As we have noted, an ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Furthermore, the ALJ must also "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck, 181 F.3d at 433. This cardinal principle applies with particular force to ALJ assessments of medical opinion evidence, as it is well-settled that "[w]here . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the

wrong reason.' " <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000) (quoting

<u>Plummer</u>, 186 F.3d at 429)).

Guided by these legal tenets, we find in this case that the ALJ's decision to afford significant weight to temporally remote, non-treating, non-examining state agency opinions, while discounting numerous contemporaneous treating source opinions, has not been adequately justified or supported on the record of these proceedings. Therefore, a remand of this case is necessary to further explain, or develop, this medical record.

On the unique facts of this case, the ALJ's reliance upon the August 2016 state agency and consulting doctors' opinions is particularly problematic on several scores. First, this judgment ran contrary to the general preferences articulated by regulations and case law that call upon ALJs to give significant weight to treating and examining source opinions, and to only favor an opinion rendered by a non-examining or non-treating source when that opinion draws greater evidentiary support from the medical record.

Second, the decision to afford significant weight to these August 2016 opinions was particularly problematic on several scores. For example, those opinions were issued at the outset of this process and in the absence of any treatment records for Weller, treatment records which later documented on an on-going basis for the severity of his symptoms. Moreover, in reaching this result, the ALJ rejected

multiple, more recent and contemporaneous treating source opinions which found that Weller was wholly disabled. Simply put, these initial opinions, which were unsupported by treatment data and pre-dated the 18 months of care and treatment provided to Weller by multiple different treating sources, cannot be relied upon to carry the Commissioner's burden in this case.

Reliance upon these preliminary non-treating source opinions is misplaced in this case for several reasons. As we have observed, where a non-treating and non-examining opinion does not take into account material medical developments which have occurred after the opinion was rendered, that opinion often cannot be relied upon by the Commissioner to carry its burden of proof. See Batdorf v. Colvin, 206 F. Supp. 3d 1012, 1023 (M.D. Pa. 2016). As a matter of law and common sense, material medical developments which take place after a state agency or consulting expert's review of a claimant's file frequently can undermine the confidence which can be placed in this non-treating and non-examining source opinion. Cadillac v. Barnhart, 84 F. App'x 163, 168 (3d Cir. 2003). In short, it is well-recognized that:

> It can be inappropriate for an ALJ to rely on a medical opinion that was issued prior to the close of the period of claimed disability, particularly if a claimant's medical condition changes significantly after the opinion is issued. See, e.g., Alley v. Astrue, 862 F. Supp. 2d 352, 366 (D. Del. 2012); Morris v. Astrue, Civ. Action No. 10–414–LPS–CJB, 2012 WL 769479, at *24 (Mar. 9, 2012). However, when a state agency physician renders an RFC assessment prior to a hearing, the ALJ may rely on the RFC [only] if it is supported by the record as a whole, including evidence that accrued after the assessment. See, e.g., Pollace v. Astrue, Civil Action No. 06–05156, 2008 WL 370590,

at *6 (E.D.Pa. Feb. 6, 2008); see also Johnson v. Comm'r of Soc. Sec.,
Civil No. 11–1268 (JRT/SER), 2012 WL 4328389, at *9 n. 13 (D.
Minn. Sept. 20, 2012); Tyree v. Astrue, No. 3:09–1091, 2010 WL
2650315, at *4 (M.D. Tenn. June 28, 2010).

Smith v. Astrue, 961 F. Supp. 2d 620, 644 (D. Del. 2013).

Applying these legal benchmarks, courts have frequently remanded cases for
further consideration by the Commissioner when great reliance is placed upon early
non-treating or non-examining source opinions, without adequate examination of the
degree to which subsequent medical developments undermined those opinions. See
e.g., McArthur v. Berryhill, No. 1:17-CV-2076, 2019 WL 1051200, at *7 (M.D. Pa.
Jan. 30, 2019), report and recommendation adopted, No. 1:17-CV-2076, 2019 WL
1040673 (M.D. Pa. Mar. 5, 2019); Foose v. Berryhill, No. 3:17-CV-00099, 2018
WL 1141477, at *9 (M.D. Pa. Mar. 2, 2018).

Here, these August 2016 non-treating and non-examining source opinions
stand in stark contrast to subsequent treating source evaluations and opinions which
span from October 2016 through November 2017. Moreover, when the state agency
and consultant opinions were issued in August 2016, it appears that these experts did
not have the benefit of any treatment or clinical evidence which found Weller to be
severely impaired. Recognizing that "[i]t can be inappropriate for an ALJ to rely on
a medical opinion that was issued prior to the close of the period of claimed
disability, particularly if a claimant's medical condition changes significantly after
the opinion is issued, see, e.g., Alley v. Astrue, 862 F. Supp. 2d 352, 366 (D. Del.

2012); <u>Morris v. Astrue</u>, Civ. Action No. 10–414–LPS–CJB, 2012 WL 769479, at

*24 (Mar. 9, 2012)," <u>Smith v. Astrue</u>, 961 F. Supp. 2d 620, 644 (D. Del. 2013), we

find that these material intervening medical developments undermine any reliance

that can be placed on these preliminary August 2016 opinions and call for further

consideration of the evidence relating to Weller's mental health.

Further, the rationale for the ALJ's decision to afford these temporally remote

opinions significant weight—the ALJ's conclusion that these August 2016 opinions

were consistent with Weller's longitudinal medical treatment records—was not

supported by Weller's medical history, which contained substantial evidence

documenting on-going and significant mental health impairments experienced by

the plaintiff. In particular, it is difficult to reconcile the ALJ's assertion that "[t]he

mental status examinations generally found the claimant within normal limits", (Tr.

17), with the actual content of those records, which were replete with references to

suicidal or homicidal thoughts on Weller's part, (Tr. 335, 338, 341, 346, 347, 349),

contained references to Weller discussing his potential for harming others, (Tr. 329,

334, 340), described instances in which he verbally lashed out at others, (Tr. 329),

and reported that Weller would become angered if strangers looked at him. (Tr. 343).

Simply put, there is nothing normal about a worker who regularly reports that he

thinks about killing himself or others. Therefore this longitudinal record, taken as a

whole, seems to contradict, rather than support, these preliminary August 2016 medical opinions.

Finally, we note that the ALJ's decision did not address, analyze, or even acknowledge that multiple treating source GAF scores consistently found over an 18-month period that Weller was severely impaired. The failure to even acknowledge these medical findings also compels a remand here since it is well-settled that:

> [C]ourts in the Third Circuit have repeatedly held that the ALJ's failure to specifically discuss a GAF score that supports serious impairments in social or occupational functioning is cause for remand. See, e.g., West v. Astrue, No. 09–2650, 2010 WL 1659712, at *4–6 (E.D. Pa. Apr. 26, 2010) (Baylson, J.) (remanding for failure to consider GAF scores and citing seven district court cases from 2004 through 2009 taking the same approach); Sweeney v. Comm'r of Soc. Sec., 847 F. Supp. 2d 797, 805 (W.D. Pa. 2012); Metz v. Astrue, No. 10–383, 2010 WL 3719075, at *14 (W.D. Pa. Sept. 17, 2010) (ALJ's determination not supported by substantial evidence where ALJ "did not mention any GAF scores at all and provided no rationale for rejection of this evidence."); Wiggers v. Astrue, No. 09–86, 2010 WL 1904015, at *8–9 (W.D. Pa. May 10, 2010) (GAF scores constitute acceptable medical evidence that must be addressed by an ALJ in making a determination regarding a claimant's disability); Pounds v. Astrue, 772 F. Supp. 2d 713, 726 (W.D. Pa. 2011); Bonani v. Astrue, No. 10–0329, 2010 WL 5481551, at *6–7 (W.D. Pa. Oct. 15, 2010), report and recommendation adopted, 2011 WL 9816 (W.D. Pa. Jan. 3, 2011); Lust v. Comm'r of Soc. Sec., No. 10–261, 2010 WL 2773205, at *5 (W.D. Pa. July 13, 2010); Burkett v. Astrue, No. 09–26, 2010 WL 724509, at *9 (W.D. Pa. Feb. 26, 2010); Glover v. Astrue, No. 07–2601, 2008 WL 517229, at *1–2 (E.D. Pa. Feb. 27, 2008); Holmes v. Barnhart, No. 04–5765, 2007 WL 951637, at *11 (E.D. Pa. Mar. 26, 2007) (remand required because of ALJ's failure to acknowledge claimant's GAF score of 50); Colon, 424 F. Supp. 2d at 813–14; Dougherty, 2006 WL 2433792, at *10; Span ex rel. R.C. v. Barnhart, No. 02–7399, 2004 WL 1535768, at *6–7 (E.D.

Pa. May 21, 2004) (concluding that it is not sufficient for an ALJ to mention GAF scores without adequately explaining how or why they were discounted); Escardille v. Barnhart, 2003 WL 21499999, at *6–7 (E.D. Pa. June 24, 2003) (remand required because ALJ opinion did not reveal he seriously considered claimant's GAF score of 50). In other words, in explaining the rationale for denying disability, the ALJ must demonstrate that he seriously considered and weighed the importance of the GAF scores. See Colon, 424 F. Supp. 2d at 813; Span, 2004 WL 1535768, at *4, 6, 7. If the ALJ discounts the GAF score, he must specify his reasons for doing so. Dougherty, 2006 WL 2433792, at *9–10; Span, 2004 WL 1535768, at *6–8 (citing Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994)); see Diaz, 577 F.3d at 505–06; Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 435 (3d Cir. 1999) ("[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence . . . .") (citation omitted).

Rivera v. Astrue, 9 F. Supp. 3d 495, 504–05 (E.D. Pa. 2014). Therefore, a remand to consider, and expressly address, these GAF scores and their impact upon Weller's residual functional capacity is warranted in this case.

Yet, while case law calls for a remand and further proceedings by the ALJ in this case assessing this claim in light of this evidence, nothing in our opinion should be construed as suggesting what the outcome of that final and full analysis should be. Rather, that final assessment of the evidence must await a thorough consideration and development of this evidence on remand by an ALJ. Therefore, nothing in this opinion should be deemed as expressing a view on what the ultimate outcome of any reassessment of this evidence should be. Rather, that task should remain the duty and province of the ALJ on remand.

## IV. Conclusion

Accordingly, for the foregoing reasons, IT IS ORDERED that this case be REMANDED for further consideration of the Plaintiff's application.

An appropriate order follows.


/s/ Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge


Submitted this 21st day of May, 2020